**Paul Benjamin WEST,
Plaintiff–Appellee,**

v.

**The WESTERN CASUALTY AND SURETY COMPANY, a corporation,
Defendant–Appellant.**

**No. 87–1938.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 12, 1988.

Decided May 4, 1988.
Rehearing and Rehearing En Banc
Denied June 23, 1988.

John W. Leskera, Dunham, Bowman & Leskera, East St. Louis, Ill., for defendant-appellant.

Jerome Mirza, Jerome Mirza & Assoc., Ltd., Bloomington, Ill., for plaintiff-appellee.

Before WOOD, Jr., and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

RIPPLE, Circuit Judge.

In this diversity action, the Western Casualty and Surety Company (Western) appeals from a jury verdict in favor of Paul West, the appellee, in the amount of $3 million in compensatory damages and $2 million in punitive damages. Mr. West sued Western, his employer's workers' compensation insurance carrier, claiming that it committed fraud by deceiving him about his rights under the Illinois Structural Work Act, Ill.Rev.Stat. ch. 48, para. 69. For the reasons set forth in this opinion, we believe that the jury verdict must be left undisturbed. However, we remand the case to the district court so that it may clarify its judgment regarding Western's right to a set-off for future workers' compensation payments made to Mr. West.

Accordingly, we affirm in part and remand in part.

## I

### Facts

On April 23, 1979, Mr. West was rendered a paraplegic when he fell from a scaffold. At the time, Mr. West was performing carpentry work on the new home of Richard Mills, an architect, in McLean County, Illinois. No one saw Mr. West fall from the scaffold, and Mr. West has no idea how he fell.

Mr. West was employed to work on Mr. Mills' home by Tom Schieber, with whom Mr. Mills had contracted to build his home. Mr. West and Mr. Schieber were close personal friends. At the time of the accident, Mr. Schieber was insured by Western for $100,000 of workers' compensation coverage and $300,000 of manufacturer and contractor coverage. The latter policy was not directly applicable to Mr. West's injury because it excluded claims made by an employee. Western has paid all of Mr. West's medical bills and he has received the maximum amount available to him under the Illinois Workers' Compensation Act. Mr. West never brought an action against Mr. Mills for violating the Illinois Structural Work Act, although Illinois law recognizes such an action. Ill.Rev.Stat. ch. 48, para. 69.

After the accident, the West family was visited several times by Gordon Stiely, claims manager and adjuster for Western's office in Decatur, Illinois. Memoranda introduced at trial showed that Western was very concerned that Mr. West would contact an attorney and bring a Structural Work Act suit against Mr. Mills. Western feared that Mr. Mills would then bring a third-party action against Mr. Schieber, substantially increasing Western's potential liability. Memoranda from Mr. Stiely to his supervisors at Western repeatedly referred to Mr. Stiely having the case "under control." Testimony offered at trial suggested that the phrase "control" meant that Mr. Stiely was successfully convincing

Mr. West not to contact an attorney. Mr. Stiely kept the case "under control" by visiting Mr. West on several occasions and communicating with him often. The correspondence between them that was admitted at trial showed that Mr. Stiely went to great lengths to develop a friendship with Mr. West, and that these efforts were successful. The West family invited Mr. Stiely for lunch; they gave him cherry pie; they expressed concern for his health; and they clearly trusted him. They also sent Mr. Stiely a Christmas card, which Mr. Stiely promptly reported to his supervisors as evidence of his "rapport" with the Wests. *See* Plaintiff's Ex. 35. Mr. Stiely always sent thank you notes to the Wests after their meetings, and he was never bashful in complimenting Mrs. West on her culinary skills.

During the two years after the accident, Western engaged in conduct intended to ensure that Mr. West would not contact an attorney. For example, Western deliberately chose not to interview witnesses who had been at the scene of the accident for fear that this might motivate Mr. West to contact an attorney. When Mr. West wondered why workers' compensation checks were being sent to him by an attorney, Western began sending the checks from another source. When Mr. West requested reimbursement for expenses that Western considered dubious under the workers' compensation scheme, Western paid some of the expenses. As the expiration of the statute of limitations approached for filing a Structural Work Act suit, Mr. Stiely refused to respond to Mr. West's phone calls. Western also delayed a hearing on Mr. West's workers' compensation claim until after the statute of limitations had run.

Mr. West does not contend that the above actions, standing alone, were adequate to state a cause of action against Western for fraud. Rather, Mr. West's claim is that Western committed fraud by deliberately misrepresenting to him his legal rights. According to the testimony of Mr. West and his wife,[1] Mr. Stiely told

---

1. Mrs. West testified as follows:

Q. So that from April the 23rd of 1979 up

them that they did not need a lawyer because Western would protect their legal rights and ensure that they received everything they were legally entitled to receive. Mr. West specifically testified, at one point, that Mr. Stiely told him that he had no legal rights other than workers' compensation. Western did not deny at trial that it did not want Mr. West to consult with an attorney. However, Western denied that Mr. Stiely made any factual misrepresentations to Mr. West, and it claimed that Mr. Stiely told Mr. West of the Structural Work Act and of his right to bring a suit under that Act. Western also argued that Mr. West told Mr. Stiely that he did not want to file a Structural Work Act suit because he wanted to avoid doing anything that could potentially harm Mr. Schieber, Mr. West's employer and close friend. Faced with these contradictory versions of the facts, the jury apparently believed Mr. West. It awarded him $3 million in compensatory damages and $2 million in punitive damages.

## II

### The District Court Opinion

Western filed a post-trial motion seeking a judgment notwithstanding the verdict or,

in the alternative, a new trial. This motion alleged more than 150 trial errors, including all of the contentions now raised on appeal. The district court filed an order on May 11, 1987, denying Western's requested relief. *West v. Western Casualty*, No. 82–5167, order (S.D.Ill. May 11, 1987) [hereinafter Order]; R. 60.

The first argument raised by Western was that Mr. West's action was barred by the exclusivity provision of the Illinois Workers' Compensation Act, Ill.Rev.Stat. ch. 48, para. 138.5(a). The district court held that this exclusivity provision did not bar Mr. West's fraud action because Mr. West's injury from the alleged fraud did not arise out of the course of his employment, but arose out of his relationship with Western as a result of his workers' compensation claim. The court said that "[t]he alleged fraud practiced on the plaintiff in this case was not directly arising out of the workmens [sic] compensation claim but only incidentally so." Order at 6.

The district court then determined that the evidence presented at trial was sufficient to justify the award of compensatory and punitive damages. The court, referring back to its earlier denial of Western's

until the time that you saw Mr. Williams in 1982, you had no legal advice concerning this case?
A. No, no. Gordon told us we were receiving what we legally were entitled to. We felt confident of what he was telling us.
. . . .
Q. Before this occasion that you saw Attorney Williams in 1982 and then met me, had you ever heard of the Illinois Structural Work Act?
A. No.
. . . .
Q. Did you, before that occasion that you met Attorney Williams and myself, did you know that Paul could have filed a lawsuit against the owner architect of this property, Richard Mills, in a court of law seeking damages?
A. No.
. . . .
Q. What did you believe, up until that time in March of 1982, was your legal remedy?
A. We believed what Gordon had told us, that we were receiving everything that we were legally entitled to, and we had no reason to doubt what he told us.
Tr. of Oct. 22, 1986 at 89–91.

Mr. West testified as follows:
Q. Was there any discussion about what your rights were, or whether you should have a lawyer, or anything like that?
A. Well, we were concerned about that, whether we should have a lawyer come in and help us with this, to see if we were getting what we were supposed to through Workmen's Comp, and Gordon assured us that Workmen's Comp would take care of everything, and that's all the rights we really had was through Workmen's Comp.
Q. Paul, up to the time that you saw attorney Robert Williams, I think it was in March of, March or February of 1982, and that you saw me, up until that time did you, had you ever even heard or know of the Structural Work Act?
A. No, I sure didn't, no.
Q. Did you, up until that time, know that you had any other rights other than Worker's Compensation?
A. No, that's all the rights that we thought we had was through Workmen's Compensation, and this is the information that we had from Gordon, from his counselling, that's what we understood.
*Id.* at 204–06.

motion for a directed verdict, concluded that there was sufficient evidence from which a jury could conclude that Western had made a misrepresentation of fact and that Mr. West had reasonably relied on that misrepresentation.

With respect to the imposition of punitive damages, the district court determined that punitive damages could permissibly be imposed against Western because the jury reasonably could conclude that Mr. Stiely was employed in a managerial capacity by Western and that he influenced policy decisions by Western. The court then said that there was "evidence in this case from which the jury could have found that Stiely's conduct was so egregious as to rise to the level warranting the award of punitive damages." *Id.* at 8.

The district court then determined that it had properly instructed the jury with respect to the Structural Work Act. Western contended that Mr. West should have been required to prove conclusively that he could have recovered under the Structural Work Act before he could be entitled to prevail in a fraud action. The court held that this argument was meritless because the court had instructed the jury about the elements of a Structural Work Act claim and about the elements of damage that would have been recoverable in such a case.

## III

### Analysis

A. *Exclusivity of Workers' Compensation*

■ Western argues that Mr. West's fraud action should have been barred under the exclusivity provision of the Illinois Workers' Compensation Act. In relevant part, the exclusivity provision of the Workers' Compensation Act reads:

No common law or statutory right to recover damages from the employer [or] his insurer ... for injury or death sustained by any employee while engaged in the line of his duty as such employee, other than the compensation herein provided, is available to any employee who

is covered by the provisions of this Act. . . .

Ill.Rev.Stat. ch. 48, para. 138.5(a).

In *Robertson v. Travelers Ins. Co.,* 95 Ill.2d 441, 69 Ill.Dec. 954, 448 N.E.2d 866 (Ill.1983), the Illinois Supreme Court interpreted this statute to bar an action against an insurance company for intentional delay in making workers' compensation payments. The rationale for this interpretation was that the Workers' Compensation Act expressly provides for the payment of penalties to a claimant when "there has been any unreasonable or vexatious delay of payment. . . ." Ill.Rev.Stat. ch. 48, para. 138.19(k). Because the Workers' Compensation Act permits a claimant to obtain penalties when a payment is unreasonably delayed, the court said that a claimant must use the workers' compensation mechanism when alleging intentional delay in payment.

According to Western, *Robertson* should be read to bar the present action. Western submits that the mere fact that this case is styled as a "fraud" action as opposed to "outrageous conduct" or "intentional infliction of emotional distress" "is a distinction without a difference." Appellant's Br. at 15. Western claims that this case, like *Robertson,* involves an allegation of injury that occurred within the employment relationship, and therefore, should be barred.

In our view, Western reads *Robertson* too broadly. The alleged injury in *Robertson* arose out of a delay in payment. The Illinois Workers' Compensation Act expressly permits a claimant to seek penalties when payments are delayed. In this case, Mr. West was not injured by a delay in payment, but by deception about his rights in connection with the Structural Work Act, Ill.Rev.Stat. ch. 48, para. 69. The Structural Work Act allows an injured employee to bring a cause of action against a third party separate from a workers' compensation claim against the employer. Unlike the situation of unreasonable delay, nothing in the Workers' Compensation Act provides any relief to an individual who has been deprived of a right to bring a Structural Work Act suit against a third party.

The alleged injury here is not, in the words of the *Robertson* court, "covered by a provision of the Act." 69 Ill.Dec. at 957, 448 N.E.2d at 869. Thus, this case is vastly different from *Robertson*, and the district court correctly determined that this action was not barred by the Workers' Compensation Act.

### B. *The Elements of Fraud*

■ Western contends that the evidence presented at trial was insufficient to support a finding of fraud. The elements of fraud in Illinois are well-established. To prevail in a fraud action the plaintiff must prove: (1) that the defendant made false statements of material fact, and not of opinion; (2) knowing that they were false; (3) intending that the plaintiff rely on them; (4) that plaintiff did rely; (5) that this reliance was justified; and (6) that the plaintiff was damaged thereby. *General Motors Acceptance Corp. v. Central Nat'l Bank*, 773 F.2d 771, 778 (7th Cir.1985). A plaintiff must prove the elements of fraud by clear and convincing evidence. *Kinsey v. Scott*, 124 Ill.App.3d 329, 79 Ill.Dec. 584, 589, 463 N.E.2d 1359, 1364 (1984); *Gordon v. Dolin*, 105 Ill.App.3d 319, 61 Ill.Dec. 188, 192, 434 N.E.2d 341, 345 (1982).

Western submits that the first and fifth elements of fraud were not satisfied. Western argues that Mr. West failed to identify any misrepresentation by Western that can be characterized as a misrepresentation of fact; it contends that Mr. Stiely's alleged statements to the West family were merely statements of opinion. With respect to justifiable reliance, Western argues that Mr. West knew that Western was in an adversarial position, and that Mr. West therefore had no justifiable right to rely on any representations made by Mr. Stiely. Western contends that, because Mr. West could have easily consulted with an attorney about his legal rights, Mr. West's reliance on Mr. Stiely cannot be reasonable under Illinois law.

#### 1. Misrepresentation of Fact

■ A statement that merely expresses an opinion or that relates to future or contingent events, rather than past or present facts, does not constitute an actionable misrepresentation. *Peterson Indus. v. Lake View Trust & Sav. Bank*, 584 F.2d 166, 169 (7th Cir.1978). Whether a statement is one of fact or of opinion depends on all the facts and circumstances of a particular case. *Buttitta v. Lawrence*, 346 Ill. 164, 178 N.E. 390, 393 (1931); *Duhl v. Nash Realty Inc.*, 102 Ill.App.3d 483, 57 Ill.Dec. 904, 910, 429 N.E.2d 1267, 1273 (1981); *Perlman v. Time, Inc.*, 64 Ill. App.3d 190, 20 Ill.Dec. 831, 837, 380 N.E.2d 1040, 1046 (1978); *Parker v. Arthur Murray, Inc.*, 10 Ill.App.3d 1000, 1003, 295 N.E.2d 487, 490 (1973); *see also Kinsey*, 79 Ill.Dec. at 589, 463 N.E.2d at 1364 (misrepresentation of law with respect to city's building code treated as a misrepresentation of fact "under the circumstances"). Although a statement may be technically true, it may be considered fraudulent if necessary qualifying material is omitted. *General Motors Acceptance Corp.*, 773 F.2d at 778; *Perlman*, 20 Ill.Dec. at 835, 380 N.E.2d at 1044. A statement that, standing alone, appears to be a statement of opinion, nevertheless may be a statement of fact when considered in context. Courts focus on the circumstances surrounding the representation to determine whether the plaintiff may have justifiably relied on the opinion as though it were a statement of fact. *Peterson Indus.*, 584 F.2d at 169. Among the relevant factors in such a case are the access of the parties to outside information and the relative sophistication of the parties. The Illinois Supreme Court said in *Buttitta*:

> Wherever a party states a matter which might otherwise be only an opinion, but does not state it as the expression of the opinion of his own, but as an affirmative fact material to the transaction, so that the other party may reasonably treat it as a fact and rely upon it as such, then the statement clearly becomes an affirmation of the fact within the meaning of the rule against fraudulent misrepresentation.

178 N.E. at 393.

Illinois courts have also emphasized that statements of opinion are treated as state-

ments of fact when the speaker has held himself out as having special knowledge. In *Duhl*, the court said, quoting Prosser:

[I]t has been recognized very often that the expression of an opinion may carry with it an implied assertion, not only that the speaker knows no facts which would preclude such an opinion, but that he does know facts which justify it. There is quite general agreement that such an assertion is to be implied where the defendant holds himself out or is understood as having special knowledge of the matter which is not available to the plaintiff, so that his opinion becomes in effect an assertion summarizing his knowledge.

57 Ill.Dec. at 910, 429 N.E.2d at 1273 (quoting W. Prosser, *Handbook of the Law of Torts* § 109 (4th ed. 1971)). Thus, the general rule is that it is not "the form of the statement which is important or controlling, but the sense in which it is reasonably understood." *Prosser and Keeton on Torts* § 109, at 755 (W. Keeton 5th ed. 1984).

■ We cannot overturn the jury's determination that Western made misrepresentations of "fact" to Mr. West. Mr. West alleges, and, in light of the jury's verdict, we must accept as true, that he was specifically told that he had no legal rights other than workers' compensation. He also claims that he was told that he did not need a lawyer because Western would protect his legal rights and Western would ensure that he received everything he was legally entitled to receive. Taken as a whole, these statements may be reasonably understood as assertions of fact. Western held itself out to Mr. West as being an expert in the area of workers' compensation, and Western was under a state law duty to Mr. West to be honest and forthright. *See* Ill.Rev.Stat. ch. 48, para. 138.-4(h). The alleged statement that Mr. West had no legal rights other than his rights under workers' compensation could easily have been viewed by Mr. West as a pure statement of fact. Moreover, Western told Mr. West that it would take care of his legal needs and that it would provide him with all legal benefits to which he was entitled. We thus cannot say, on the facts presented by this record, that Illinois would treat the statements of Western as opinion. Accordingly, we cannot disturb the jury's verdict on this point.

2. Justifiable Reliance

[6, 7] Western also submits that Mr. West could not have reasonably or rightfully relied on any of the claimed misrepresentations. In Western's view, Mr. West should have investigated his legal rights by consulting an attorney. This court recently addressed the issue of justifiable reliance and the duty to investigate under Illinois law in *Teamsters Local 282 Pension Trust Fund v. Angelos*, 839 F.2d 366 (7th Cir.1988). In *Teamsters*, we noted that Illinois law with respect to justifiable reliance requires a court to examine all the circumstances. A plaintiff has a duty to investigate further when the circumstances "reasonably require, as a matter of prudence, that an investigation be undertaken." *Id.* at 371. We said that "[i]n short, the crucial question is whether the plaintiff's conduct was unreasonable under the circumstances and ' "in light of the information open to him, that the law may properly say that this loss is his own responsibility." ' " *Id.* (quoting *Chicago Title & Trust Co. v. First Arlington Nat'l Bank*, 118 Ill.App.3d 401, 73 Ill.Dec. 626, 672, 454 N.E.2d 723, 729 (1983) (quoting W. Prosser, *Handbook of the Law of Torts* § 108, at 715 (4th ed. 1971))).

■ A plaintiff's duty to investigate further is absolved, however, when the defendant's deliberate misrepresentations have lulled the plaintiff into a false sense of security, or when his assurances were intended to block further inquiry. *Marino v. United Bank*, 137 Ill.App.3d 523, 92 Ill.Dec. 204, 207, 484 N.E.2d 935, 938 (1985); *Carter v. Mueller*, 120 Ill.App.3d 314, 75 Ill.Dec. 776, 781, 457 N.E.2d 1335, 1340 (1983); *Duhl v. Nash Realty Inc.*, 102 Ill.App.3d 483, 57 Ill.Dec. 904, 911–12, 429 N.E.2d 1267, 1274–75 (1981); *Mother Earth, Ltd. v. Strawberry Camel, Ltd.*, 72 Ill.App.3d 37, 28 Ill.Dec. 226, 238 (1979); *cf. Citizens Sav. and Loan Ass'n v. Fischer*, 67 Ill.App.2d 315, 214 N.E.2d 612, 616

(1966). For example, in *Carter*, the plaintiff had no duty to examine an apartment before renting it because the defendant had told the plaintiff that the apartment would be in the same condition as a model apartment, and that "everything had been done." 75 Ill.Dec. at 781, 457 N.E.2d at 1340. In *Mother Earth*, the plaintiffs had no duty to investigate further because the defendant inhibited the inquiry by telling the plaintiffs that business books were unavailable. 28 Ill.Dec. at 238, 390 N.E.2d at 405. And in *Citizens*, the plaintiffs had no duty to investigate when they had been specifically told by the defendants that "they needed no other professional counsel." 214 N.E.2d at 616.

These principles of Illinois law require that we disagree with Western that Mr. West cannot have been justified in relying upon Mr. Stiely. Mr. Stiely's representations to Mr. West were not facially suspicious. The general rule in Illinois is that an employee's only cause of action after an employment accident is to bring a workers' compensation claim. Western's alleged representation that Mr. West had no rights other than workers' compensation would not have caused the ordinary individual to suspect deceit. Therefore, we cannot overturn the jury's verdict and say that the "plaintiff's conduct was [so] unreasonable under the circumstances ... ' "that the law may properly say that this loss is his own responsibility." ' " *Teamsters*, 839 F.2d at 371 (quoting *Chicago Title & Trust Co.*, 73 Ill.Dec. at 672, 454 N.E.2d at 729 (quoting W. Prosser, *Handbook of the Law of Torts* § 108, at 715 (4th ed. 1971))).

Moreover, there was ample evidence to support a jury's finding that the purpose of Mr. Stiely's alleged misrepresentations was to lull Mr. West into a false sense of security so that he would not inquire further. As in *Citizens*, Mr. Stiely told the West family that "they needed no other professional counsel." 214 N.E.2d at 616. The record permits a jury finding that Western engaged in conduct, over a long period of time, designed to dissuade Mr. West from retaining an attorney. For example, when Mr. West requested reimbursement for expenses that Western considered dubious,

Western nevertheless paid some of the expenses. When Mr. West wondered why workers' compensation checks were being sent by an attorney, Western began sending the checks from another source. And when Western executives requested statements from potential witnesses of the accident, Western's local counsel and Mr. Stiely advised against taking those statements because they did not want Mr. West to be alarmed. Under these circumstances, there was ample evidence to support a jury determination that Western attempted to lull Mr. West into a false sense of security.

We also note that the relationship between a workers' compensation insurance carrier and an injured employee is not directly akin to the common adversarial relationship between a purchaser and a vendor. Western argues that Mr. West should have known that an adversarial relationship existed between himself and Western, similar to the relationship in standard commercial transactions. However, the workers' compensation context is significantly different. Illinois law imposes on insurance companies the obligation of good faith toward injured employees. The Workers' Compensation Act provides that "[i]t shall be unlawful for any ... insurance company ... to interfere with, restrain or coerce an employee in any manner whatsoever in the exercise of the rights or remedies granted to him or her by this Act...." Ill.Rev. Stat. ch. 48, para. 138.4(h). Admittedly, this statute is not directly applicable here because Western did not restrain or coerce Mr. West with respect to his direct rights under the Illinois Workers' Compensation Act; Western's alleged fraud was with respect to Mr. West's rights under the Structural Work Act. Regardless, Mr. West had a right to expect that Western would treat him with honesty and forthrightness and not, as the jury found, affirmatively mislead him. The relationship between Mr. West and Western was materially different from routine commercial transactions.

C. *Structural Work Act Jury Instructions*

█ The basis for Mr. West's fraud action was that he was deceived about his

rights under the Structural Work Act, Ill. Rev.Stat. ch. 48, para. 69.[2] Western submits that Mr. West should not have been allowed to prevail in his fraud action without proving that he would have prevailed in a Structural Work Act case.

In support of its contention that a fraud plaintiff must prove the cause of action in the underlying suit, Western cites several cases, all of which are from jurisdictions other than Illinois.[3] Illinois has not squarely addressed the question. One recent intermediate appellate court case suggests, albeit somewhat obliquely, that a plaintiff does not need to prove conclusively the elements of an underlying cause of action when he alleges that he was fraudulently denied a right to bring that cause of action. In *McCarter v. State Farm Mut. Auto. Ins. Co.*, 130 Ill.App.3d 97, 85 Ill.Dec. 416, 473 N.E.2d 1015 (1985), a motorcyclist brought a fraud action against the insurer of the driver of an automobile that collided with him. The motorcyclist alleged that the insurer had fraudulently induced him to settle his case. The defendant insurer argued that its own liability for fraud was dependent upon the liability of the driver, and that a judgment against the driver was necessary in order to establish the insurer's liability on the fraud claim. The insurer also argued that the statute of limitations for personal injury actions had expired, and therefore, the fraud action should also have been barred. The appellate court rejected the insurer's contention. The court said that the motorcyclist's fraud action was distinct from any cause of action the plaintiff may have had against the driver, and that proof of negligence by the automobile driver was not a necessary condition to proving fraud by the insurer. The court said:

> The defendant is being sued for fraudulent conduct in settling the plaintiff's

claim against Couch. Couch's civil liability for the plaintiff's injuries is not relevant to the fraud action since the defendant settled the plaintiff's claim regardless of whether Couch was negligent or not. *In order to recover for the defendant's wrongful conduct in settling the claim, the plaintiff does not have to prove that Couch was negligent.* Since the fraud action constitutes a separate claim, it is not subject to the two year limitation period for personal injuries but is instead covered by a five year limitations period.

*Id.* 85 Ill.Dec. at 419, 473 N.E.2d at 1018 (emphasis supplied). While *McCarter* can hardly be ignored, the case is sufficiently different in its procedural posture from the present one to make us reluctant to read it as stating definitively a principle of Illinois law sufficiently broad to control this case. Our reluctance is somewhat increased when we note that other state jurisdictions that have addressed the issue have held that it is necessary to establish the validity of the underlying cause of action. *See, e.g., Beeck v. Kapalis*, 302 N.W.2d 90, 94 (Iowa 1981); *De Vito v. New York Cent. Sys.*, 22 A.D.2d 600, 257 N.Y.S.2d 895 (1965); *see also Automobile Underwriters v. Rich*, 222 Ind. 384, 53 N.E.2d 775, 777 (1944). *See generally Sade v. Northern Natural Gas Co.*, 483 F.2d 230, 236 (10th Cir.1973) (assuming, without holding, that a fraud plaintiff must prove the worth of the underlying cause of action); *Firemen's Ins. Co. v. Jones*, 245 Ark. 179, 431 S.W.2d 728 (1968) (same).

Because an alternate basis exists for deciding this issue, we need not resolve definitively this difficult state law question. Even if Illinois law requires that Mr. West prove all the elements of a Structural Work Act suit, we believe that the jury instructions were adequate to submit the case to

---

**2.** In pertinent part, the liability provision of the Illinois Structural Work Act reads:

> For any injury to person or property, occasioned by any wilful violations of this Act, or wilful failure to comply with any of its provisions, a right of action shall accrue to the party injured, for any direct damages sustained thereby....

Ill.Rev.Stat. ch. 48, para. 69.

**3.** *Automobile Underwriters v. Rich,* 222 Ind. 384, 53 N.E.2d 775 (1944); *Indiana Ins. Co. v. Handlon,* 216 Ind. 442, 24 N.E.2d 1003 (1940); *De Vito v. New York Cent. Sys.,* 22 A.D.2d 600, 257 N.Y.S.2d 895 (1965); *Inman v. Merchants Mut. Casualty Co.,* 274 A.D. 320, 83 N.Y.S.2d 801 (1948).

the jury on that theory. The district court instructed the jury of the elements of a Structural Work Act suit, including the standard of liability. The jury was instructed as follows:

There was in force in the State of Illinois at the time of the occurrence a statute called the Structural Work Act which provided that all scaffolds erected or constructed for use in the construction of any building shall be so erected and constructed, placed and operated as to give proper and adequate protection to the life and limb of any person employed or engaged thereon. Any owner, contractor, architect, or subcontractor having charge of the work shall comply with all the terms thereof. For any injury to a person occasioned by a violation of this Act, a right of action shall accrue to the party injured.

Under the statute, it is possible for more than one person to "have charge of" the work. One or more persons can have charge of the overall work, and other persons can have charge of the phase of the work in connection with which an injury occurs. In that event, all of them would "have charge of" the work within the meaning of the statute.

The statute is violated if a scaffold is used or operated in a condition that was not safe so as to fail to give adequate protection to the life and limb of any person employed or engaged thereon and if the party against whom the claim is made under the Structural Work Act knew of the condition of such scaffolding or in the exercise of ordinary care could have discovered it.

Appellant's App. at A–28. The jury was also instructed that the burden of proof was squarely upon the plaintiff to prove all the elements of his fraud action by clear and convincing evidence. *Id.* at A–32, A–24. Included in the district court's instruction was a requirement that the plaintiff prove by clear and convincing evidence that Western's fraudulent conduct caused Mr. West to lose a valuable right and sustain damages. *Id.* at A–32. In our view, these instructions, when read together,[4] adequately advised the jury that, in order to prevail, Mr. West had to establish, by clear and convincing evidence, the elements of a Structural Work Act Suit.[5]

Western also submits that the jury was misinstructed as to damages in a Structural Work Act suit. According to Western, the jury should have been instructed that damages in the fraud action should be limited to what Mr. West could have "received or collected" in a Structural Work Act suit. Appellant's Br. at 40. That is, Western argues that Mr. West's damages should be limited to what he would have "collected" in a Structural Work Act suit, and not necessarily what he would have obtained as a "verdict" in such a case. Therefore, Western argues, it should have been allowed to introduce evidence of Mr. Mills' net worth and available insurance, since that information would have affected Mr. West's ability to actually collect a settlement in a Structural Work Act suit. The district court rejected Western's proffer of this evidence because it would have opened "a Pandora's Box of problems," and because it believed that the evidence was no more relevant in the fraud action than it would have been in the underlying Structural Work Act suit. Order at 11–12.

We agree with the district court that such an inquiry would have been far too speculative. As the district court noted, if the damages had been so limited, the court would have been required to hear evidence relating to the net worth of Mr. Mills, the

**4.** We also note that the jury was instructed on the elements of damage recoverable under the Structural Work Act. This instruction further focused the jury's attention on a violation of the Act as a basis for liability.

**5.** The transcript of the instruction conference makes clear that, at that point in the litigation, the district court did not believe that, in order to establish fraud, it was necessary to prove a violation of the Structural Work Act. Indeed, the court rejected several instructions proffered by the defendant on that ground. However, in reviewing the instructions during its consideration of the posttrial motions, the district court explicitly noted that the instructions given were adequate to present the case under the defendant's theory.

amount of his insurance coverage, the solvency of the insurance company, the net worth of Mr. Schieber, the amount of his insurance coverage, the solvency of his insurer, etc. In our view, the district court correctly concluded that this evidence would not have been relevant in proving Mr. West's damages. Rather, Mr. West's damages should be measured by what he potentially would have obtained as a *judgment* in a Structural Work Act suit. *See Richardson v. Economy Fire and Casualty Co.*, 109 Ill.2d 41, 92 Ill.Dec. 516, 520, 485 N.E.2d 327, 331 (1985). In that regard, we believe that the jury instructions were adequate. The jury was instructed that damages in this action should "reasonably and fairly compensate [Mr. West] for the loss of his right to pursue a Structural Work Act case...." Appellant's App. at A–33. *See generally Sade*, 483 F.2d at 236 (holding, under similar facts, that a jury instruction was adequate which granted the plaintiff all damages that occurred "as a direct consequence of the false representations of the Defendant"). The court then instructed the jury that, in a Structural Work Act suit, Mr. West could have recovered damages for his disability resulting from his injury, for his pain and suffering, for lost wages and earnings, and for the reasonable expenses of medical care and other out-of-pocket expenses. *Id.*

### D. *Punitive Damages*

 Western argues that the imposition of punitive damages was improper as a matter of law because its conduct was neither wilful nor wanton, and because Mr. Stiely was not acting in a managerial capacity for Western. Western also contends, assuming punitive damages can be assessed against it, that the verdict of $2 million in punitive damages was excessive.

Under Illinois law, whether Western's conduct justified the imposition of punitive damages is initially a question of law. *J.I. Case Co. v. McCartin–McAuliffe Plumbing & Heating*, 118 Ill.2d 447, 114 Ill.Dec. 105, 108, 516 N.E.2d 260, 263 (1987); *.Kelsay v. Motorola, Inc.*, 74 Ill.2d 172, 23 Ill.Dec. 559, 565, 384 N.E.2d 353, 359 (1978); *Hazelwood v. Illinois Cent. Gulf R.R.*, 114 Ill.App.3d 703, 71 Ill.Dec. 320, 326, 450 N.E.2d 1199, 1205 (1983). If a plaintiff's factual allegations are sufficient to state a legally cognizable claim for punitive damages, submission of the issue of punitive damages to the jury becomes a matter within the discretion of the trial court. *Warren v. LeMay*, 142 Ill.App.3d 550, 96 Ill.Dec. 418, 437, 491 N.E.2d 464, 483 (1986). Thus, our primary task is to determine whether Mr. West proffered a legally cognizable claim for punitive damages. *Lipke v. Celotex Corp.*, 153 Ill.App.3d 498, 106 Ill.Dec. 422, 427, 505 N.E.2d 1213, 1218 (1987).

#### 1. Wilful and Wanton Conduct

Because of their penal nature, punitive damages are not favored in the law. *Kelsay*, 23 Ill.Dec. at 566, 384 N.E.2d at 360. In a case involving intentional fraud, "punitive damages are properly recoverable ... 'where the false representations are wantonly and designedly made.'" *Home Sav. and Loan Ass'n v. Schneider*, 108 Ill.2d 277, 91 Ill.Dec. 590, 593, 483 N.E.2d 1225, 1228 (1985) (quoting *Laughlin v. Hopkinson*, 292 Ill. 80, 126 N.E. 591, 595 (1920)). The Illinois Supreme Court has said:

> While deceit alone cannot support a punitive damage award, such damages may be allowed "where the wrong involves some violation of duty springing from a relation of trust or confidence, or where the fraud is gross, or the case presents other extraordinary or exceptional circumstances clearly showing malice and willfulness."

*Id.* (quoting *Laughlin*, 126 N.E. at 595).

In the present case, the evidence was sufficient to support the jury's conclusion that Western's false representations were "wantonly and designedly made." *Id.* The evidence of record can support a conclusion that Western engaged in conduct designed to prevent Mr. West from retaining an attorney and bringing a Structural Work Act suit. The jury was entitled to conclude that this conduct was deliberate and purposeful, orchestrated by responsible management over a significant period of time. It was designed to deceive Mr. West

by exploiting the relationship Western had with him under the Workers' Compensation Act. Therefore, the district court properly declined to disturb the jury's decision to award punitive damages.

### 2. Managerial Capacity of Mr. Stiely

██ Western argues that punitive damages cannot be imposed against it under Illinois law because Mr. Stiely was not employed by Western in a managerial capacity. In Illinois, punitive damages cannot be awarded against a corporation for the acts of its employees on a theory of respondeat superior. A corporation can be liable for punitive damages only when the responsible employee was acting in a managerial capacity or when the acts were authorized or ratified by the corporation. *Mattyasovszky v. West Towns Bus Co.*, 61 Ill.2d 31, 330 N.E.2d 509, 512 (1975); *Oakview New Lenox School Dist. v. Ford Motor Co.*, 61 Ill.App.3d 194, 19 Ill.Dec. 43, 47–48, 378 N.E.2d 544, 548–49 (1978); *Tolle v. Interstate Sys. Truck Lines*, 42 Ill.App.3d 771, 1 Ill.Dec. 437, 438–39, 356 N.E.2d 625, 626–27 (1976); *see also Douglass v. Hustler Magazine, Inc.*, 769 F.2d 1128, 1145–46 (7th Cir.1985), *cert. denied*, 475 U.S. 1094, 106 S.Ct. 1489, 89 L.Ed.2d 892 (1986).

The evidence was sufficient to allow the jury to determine whether Mr. Stiely was employed in a managerial capacity by Western. At the time of the events in question here, Mr. Stiely was the claims manager for Western's office in Decatur, Illinois. Mr. Stiely had been the Decatur Branch Manager for 26 years. Western only had six offices that were responsible for Illinois cases. Thus, each office had significant responsibility. With respect to Mr. West's claim, Mr. Stiely was responsible for assigning and directing work to several insurance adjusters and attorneys who were not Western employees. Mr. Stiely did not hesitate to refuse to inter-

view witnesses of the accident even though his superiors had requested statements. And, although Mr. Stiely often kept in contact with the home office and kept his superiors notified about events, this was not inconsistent with the finding that Mr. Stiely had significant impact or control over policy decisions.

### 3. Excessiveness of the Punitive Damage Award

██ Western submits that the award of punitive damages was excessive under the circumstances. Under both Illinois and federal law,[6] the amount of punitive damages awarded to a plaintiff is a matter for the discretion of the jury, and a reviewing court may reduce the award only when it is clearly excessive. *Hamed v. General Accident Ins. Co. of America*, 842 F.2d 170, 174 (7th Cir.1988); *Strauss v. Stratojac Corp.*, 810 F.2d 679, 686 (7th Cir.1987); *Lipke v. Celotex Corp.*, 153 Ill.App.3d 498, 106 Ill.Dec. 422, 429, 505 N.E.2d 1213, 1220 (1987); *Hazelwood v. Illinois Cent. Gulf R.R.*, 114 Ill.App.3d 703, 71 Ill.Dec. 320, 327, 450 N.E.2d 1199, 1206 (1983).

The most thorough analysis of punitive damages under Illinois law is found in *Hazelwood*. In that case, the court established a three-factor analysis for reviewing whether an award of punitive damages is excessive: (1) the nature and enormity of the wrong; (2) the financial status of the defendant; and (3) the potential liability of the defendant resulting from multiple claims. *Hazelwood*, 71 Ill.Dec. at 328, 450 N.E.2d at 1207. When examining these factors, courts should keep in mind the purposes of punitive damages—punishment and deterrence. *Id; Embassy/Main Auto Leasing Co. v. C.A.R. Leasing, Inc.*, 155 Ill.App.3d 427, 108 Ill.Dec. 170, 174, 508 N.E.2d 331, 335 (1987); *see also Hagge v. Bauer*, 827 F.2d 101, 110 (7th Cir.1987) (an award of punitive damages should be set

---

6. In this circuit, a federal court sitting in diversity applies a federal standard when reviewing the excessiveness of a jury's verdict. *See Strauss v. Stratojac Corp.*, 810 F.2d 679, 685 n. 6 (7th Cir.1987); *In re Innovative Constr. Sys.*, 793 F.2d 875, 887 & n. 10 (7th Cir.1986); *Abernathy v. Superior Hardwoods, Inc.*, 704 F.2d 963, 970– 71 (7th Cir.1983). Our cases, however, have recognized that this approach is problematic, and therefore, we have usually examined the verdict under both federal and state law. *Id.* In virtually every case, as is the result here, the federal and state standards are the same. *Id.*

aside only if it exceeds what is required to deter and punish). The burden of establishing that an award is clearly excessive is on the defendant. *See C.A.R. Leasing*, 108 Ill.Dec. at 175, 508 N.E.2d at 336.

Of the three-factor test identified in *Hazelwood*, only the first two factors are relevant here because Western is not exposed to multiple liability from different plaintiffs. With respect to the first factor, the enormity and nature of the wrong, the jury was entitled to conclude that Western's conduct in this case was not merely a single statement or incident. Rather, Western's deceitful conduct took place over nearly a two-year period, and its actions were deliberate and purposeful. Western endeavored to persuade Mr. West that Western was his ally and trusted friend, when in fact Western was concerned only about its own potential liability. The first factor of the *Hazelwood* test clearly does not favor Western's position.

Western has provided no evidence about its financial status, thereby foreclosing us from analyzing the second factor. In *Hazelwood*, the court said that "before a court can gauge the award, it must first gauge the financial position of the wrongdoer." 71 Ill.Dec. at 328, 450 N.E.2d at 1207; *see also Hamed*, at 174–75; *Douglass v. Hustler Magazine, Inc.*, 769 F.2d 1128, 1145 (7th Cir.1985), *cert. denied*, 475 U.S. 1094, 106 S.Ct. 1489, 89 L.Ed.2d 892 (1986). On appeal, Western has told us nothing about its financial situation. Nor did it provide any information to the district court. There is nothing in the record, including Western's post-trial motions, that would suggest that a $2 million award exceeds what is necessary to deter effectively Western from engaging in future conduct similar to that alleged here. *Hazelwood*, 71 Ill.Dec. at 328, 450 N.E.2d at 1207 ("Simply stated, the amount of the award should send a message loud enough to be heard but not so loud as to deafen the listener."). Western's brief on appeal and its post-trial motion merely state that the award was excessive because punitive damages in a fraud case are "duplicative" and represent a "windfall" for the plaintiff. These generalities do not help a reviewing court; puni-

tive damages are almost always duplicative and, in one sense, a windfall. *See Hamed* at 175 ("General has not produced any evidence which would establish that the amount awarded, relative to General's net worth or to MF"s damages, was too high."); *Prosser and Keeton on Torts* § 2, at 14 (W. Keeton, 5th ed. 1984); *Mattyasovszky v. West Towns Bus Co.*, 61 Ill.2d 31, 330 N.E.2d 509, 511 (1975). Therefore, because the first factor does not support Western's position, and because Western has provided us no evidence with respect to the second factor, under Illinois law we cannot overturn the jury verdict.

Under federal law, the factors discussed in *Hazelwood* are equally applicable. However, federal law incorporates the additional factor of whether the jury's award is out-of-line with awards in analogous cases. *Hagge*, 827 F.2d at 109; *Bailey v. Andrews*, 811 F.2d 366, 373 (7th Cir. 1987); *Levka v. City of Chicago*, 748 F.2d 421, 425 (7th Cir.1984). Western has cited only one case involving facts similar to this one, *Montoya v. Moore*, 77 N.M. 326, 422 P.2d 363 (1976). In *Montoya*, the New Mexico Supreme Court concluded that a $50,000 punitive damage award was grossly excessive. However, *Montoya* is vastly different from the instant case in time, place, and, to some degree, circumstance. It hardly serves as an adequate basis to upset the jury verdict in this case. We refuse to conclude from *Montoya* that $2 million in punitive damages is too high.

We fully realize that $2 million in punitive damages is a significant penalty. But Western has not provided this court, nor the court below, with a principled basis for upsetting a jury's verdict. The jury heard the testimony and observed the witnesses, and found Western's conduct reprehensible. Moreover, the district judge, who declined to reduce the punitive damages, had the opportunity to assess the demeanor of the witnesses and therefore was in a particularly good position to determine if this award was an appropriate deterrence of similar conduct in the future. *Strauss*, 810 F.2d at 686; *In re Innovative Constr. Sys.*, 793 F.2d 875, 888 (7th Cir.1986);

*Abernathy v. Superior Hardwoods, Inc.*, 704 F.2d 963, 971 (7th Cir.1983). The award of punitive damages, while high, was $1 million less than the award of compensatory damages.[7] We cannot say therefore that $2 million in punitive damages is clearly excessive or that it shocks the conscience.

### E. *Set-off*

■ As a final argument,[8] Western submits that the district court improperly refused to grant it a credit against the verdict for future workers' compensation payments that it might make to Mr. West. After trial, the district court granted Western's motion for a set-off for those payments that Western had already made to Mr. West, but it made no ruling in regard to future payments. R. 52. Western contends that the court erred in not granting a set-off for future payments.

We have reviewed the record and cannot determine whether the district court simply forgot to allow Western a set-off for future payments, or whether it affirmatively concluded that Western was not entitled to a credit for future payments. It appears that this matter may have been an oversight because, during the instruction conference, the district court expressed its view that Western would be entitled to a set-off for future payments. Tr. of Oct. 28, 1986 at 542. Because it appears that the district court merely overlooked this matter, we remand this issue to the district court so that it may clarify its judgment. To avoid any further appeals, however, we express our view on this issue.

Under the Illinois Workers' Compensation Act, an employer is entitled to a set-off for amounts it has paid an injured employee if that employee later obtains a judgment or settlement from a third-party tortfeasor. Ill.Rev.Stat. ch. 48, para. 138.5(b). The statute reads in relevant part:

Where the injury or death for which compensation is payable under this Act was caused under circumstances creating a legal liability for damages on the part of some person other than his employer to pay damages, then legal proceedings may be taken against such other person to recover damages notwithstanding such employer's payment of or liability to pay compensation under this Act. In such case, however, if the action against such other person is brought by the injured employee or his personal representative and judgment is obtained and paid, or settlement is made with such other person, either with or without suit, then from the amount received by such employee or personal representative there shall be paid to the employer the amount of compensation paid or *to be paid* by him to such employee or his personal representative including amounts paid or *to be paid* pursuant to paragraph (a) of Section 8 of this Act.

Ill.Rev.Stat. ch. 48, para. 138.5(b) (emphasis supplied).

As we read the statute, if Western were entitled to a set-off for payments already made to Mr. West, it would also be entitled to a set-off for future payments because the statute expressly refers to amounts "to be paid." The case law clearly supports this position, although the trial court may exercise its discretion in determining how to best protect the insurer's rights of reimbursement for future payments. *See Freer v. Hysan Corp.*, 126 Ill.App.3d 55, 81 Ill.Dec. 514, 466 N.E.2d 1316 (1984), *aff'd*, 108 Ill.2d 421, 92 Ill.Dec. 221, 484 N.E.2d 1076 (1985). Thus, in our view, Western is entitled to a set-off for *future* payments unless the district court erroneously decided that Western was entitled to a set-off for *past* payments.

Mr. West's brief on appeal does not object to Western being granted a set-off for

---

**7.** This contrasts sharply with a case currently pending before the United States Supreme Court concerning the excessiveness of punitive damages, *Bankers Life and Casualty Co. v. Crenshaw*, No. 85–1765, argued Nov. 30, 1987, in which the award of punitive damages exceeded by eighty times the award of compensatory damages.

**8.** Western's brief on appeal also argues that the totality of the errors committed at trial entitles it to a new trial, even if any individual error were insufficient to warrant reversing the trial court. We see no merit to this argument.

past payments, nor does it object to Western's being granted a set-off for future payments. Although the record reveals that Mr. West argued before the district court that a set-off for workers' compensation payments was not appropriate because this case involves a fraud action rather than a traditional third-party action, tr. of Oct. 28, 1986 at 542, we believe that the better view is that Western was rightfully entitled to a set-off. The unique facts of this case present a situation not easily encompassed in a literal reading of the statute. As we have already noted, this case does not involve a workers' compensation action nor a Structural Work Act suit, but instead involves an independent fraud action. Nevertheless, we believe that Illinois courts, if presented with this issue, would conclude that the set-off provision of the Workers' Compensation Act would apply. The purpose of the set-off provision is "to prevent a double recovery by an injured employee or his personal representative...." *Hartford Accident & Indem. Co. v. D.F. Bast, Inc.*, 56 Ill.App.3d 960, 14 Ill.Dec. 550, 555, 372 N.E.2d 829, 834 (1978). If Mr. West had brought a Structural Work Act suit against Mr. Mills, any recovery he would have eventually obtained would have been subject to a set-off for Western. Damages in a fraud action should mirror that which the plaintiff would have received absent the fraud. Therefore, we believe that the better course in a case such as this one is to grant a set-off. A different result would allow the plaintiff to obtain a double recovery. We must therefore vacate the damage award and remand the case for the limited purpose of permitting the district court to amend its own judgment and determine the manner in which Western will receive a set-off for future payments.

### Conclusion

With the exception of the matter of set-off noted immediately above, we do not believe that the district court committed reversible error. While this case involved many close factual issues, we must accept the resolution of those issues by the jury. Accordingly, the judgment of the district court is affirmed in part and vacated and remanded in part. The appellant shall bear the costs of this appeal.

AFFIRMED IN PART, VACATED AND REMANDED IN PART.